STATE, Respondent, v. BUTE, Appellant.

(234 N. W. 605.)

(File No. 6745.  Opinion filed January 30, 1931.)

*Harlan J. Bushfield* and *C. M. Carroll*, both of Miller, for Appellant.

*M. Q. Sharpe*, Attorney General, *Benj. D. Mintener*, Assistant Attorney General, and *Glenn W. Martens*, of Pierre, for the State.

BROWN, J.  Defendant appeals from a conviction for manslaughter in the second degree and from an order denying a new trial.

In the evening of December 6, 1926, Donald Pond, a young man about twenty-five years of age, and Clyde Humphrey, twenty-two years of age, along with three other young men of about the same age, were in a pool hall at Pierre.  Some of the party spoke of desiring to get some liquor, and a man named Johnson told them where liquor could be got, in a ravine near Dry Run Hill some two or three miles east of Pierre.  About 9 o'clock in the evening Pond and Humphrey started to get the liquor in a Ford car which had a white canvas curtain along the left side.  Johnson, who seems to have been co-operating with defendant, who was a deputy state sheriff, in the enforcement of the prohibition law, at once notified defendant of their departure and gave defendant a description of the car and told him which road he had directed the young men to return on.  Defendant got a Pierre policeman named Hartley to accompany him and started out in a car to intercept Humphrey and Pond on their return.  Having reached what

they deemed a suitable place defendant parked the car by the side of the road and switched off the lights. Soon afterwards they saw the lights of an approaching car, and when it came within a distance of about seventy-five feet from them they switched on their lights, saw by the white canvas that it was the car they desired to intercept, whereupon they stepped out into the road and commanded the occupants of the oncoming car to stop. In the ravine Humphrey and Pond had procured from some one there a glass jar about three-fourths full of moonshine whisky. Humphrey, who was driving the car, did not stop. Defendant attempted to get on the running board of the Ford but did not succeed, and after it had done a distance of about one hundred and eighty feet he drew a high-powered revolver which he carried and shot, aiming, as he says, at the left hind tire of the Ford with the intention of disabling it so that he could arrest the occupants. The bullet passed through the back of the car about three inches below the top of the metal work and about ten inches from the right-hand side of the car, passed through the back seat near the top, and struck Pond, who was sitting at the right-hand side of the front seat, in the back, entering his body directly behind the region of the heart and killing his instantly. Humphrey drove on, increasing his speed, and was followed by defendant and Hartley in their car. They overtook him as he entered the city of Pierre, and on learning from Humphrey that Pond had been shot and he thought he was dead, they at once led the way to the hospital followed by Humphrey, where a doctor was called who on examination announced that Pond was dead. While fleeing after the shot was fired Humphrey picked up the jar of monoshine which was on the floor between Pond's feet and threw it out on the road. Neither Humphrey nor Pond had weapons of any kind. Next day a coroner's inquest was held under the direction of the state's attorney of Hughes county, and the coroner's jury found "that Donald Pond came to his death by a gunshot wound supposed to have been fired from a pistol in the hands of M. J. Bute, Deputy State Sheriff, on the night of December 6th." On the return of this verdict the state's attorney and coroner had some conversation with the jury in regard to stating the cause or reason for the shooting, and the jury added to the verdict the words "in his official discharge of his duty as such officer." Shortly after December 7th, Roy

Pond, the father of Donald Pond, who was a farmer living some forty miles northwest of Pierre, came to Mr. Horner, the state's attorney, and asked him to issue a warrant for defendant for the killing of his son. The state's attorney refused to institute any prosecution. Roy Pond then went before a justice of the peace and asked permission to file a complaint charging defendant with murder. The justice called upon the state's attorney, who advised against any prosecution of defendant. Later a complaint seems to have been filed with the county judge of Hughes county as a committing magistrate, and a warrant of arrest was issued by him upon which defendant was brought before him for preliminary examination. Glenn W. Martens, a member of the bar of Hughes county, conducted the examination on behalf of the prosecution, and at the close of the examination the county judge discharged the defendant. The state's attorney appeared at this preliminary hearing and stated his position as being adverse to any prosecution of defendant. Thereafter a complaint was filed with Circuit Judge John F. Hughes as a committing magistrate, and defendant was arrested and brought before him for examination, at which time the state's attorney made a motion reciting all proceedings and attempted proceedings from the institution of the coroner's inquest down to the time of the making of the motion and concluded with a motion that the proceedings be dismissed and the defendant discharged. This motion was denied, and the examination held and Judge Hughes bound defendant over for trial at the circuit court. Thereupon the state's attorney presented and filed with Judge Hughes a statement in writing covering about twelve pages of the printed record, in which he gave a full history of the entire transaction from the standpoint of the defendant, which was in the form of a petition by the state's attorney requesting that no proceedings be taken against defendant, and at the same time filed with Judge Hughes an affidavit of prejudice against Judge Hughes. The prayer of the petition was denied, and Judge Hughes directed the state's attorney to file an information against defendant, which was done. As soon as the information was filed, Judge Hughes called in Judge Bottum to act in the case and all subsequent proceedings were had before Judge Bottum. At the May, 1927, term of court in Hughes county, Judge Bottum presided. Defendant's attorney moved to quash the information because no

legal preliminary examination had been given to defendant; because the duly elected state's attorney of Hughes county was of opinion that no offense had been committed and therefore had objected to filing any information against defendant; because an affidavit of prejudice had been filed against Judge Hughes and he was without jurisdiction to order any information to be filed; and on the ground that an order of Judge Hughes, purporting to appoint Mr. Martens as special prosecuting attorney was without jurisdiction and void. In support of this motion the defendant called as witnesses Glenn W. Martens and Mr. Horner, the state's attorney. Mr. Martens testified that he was not the state's attorney of Hughes county, but was appointed by the court for the purpose of prosecuting this case; that he had no arrangements with the state's attorney of Hughes county for any compensation. The state's attorney testified to his having opposed any prosecution of the defendant; that he did not think the defendant had committed any offense, and that he did not consider himself qualified to prosecute the case; that he had no objection to Mr. Martens prosecuting the case. The motion to quash the information was denied, and Judge Bottum made a similar order that Mr. Martens be appointed special prosecutor to prosecute the case with all the powers of the state's attorney for that purpose.

Defendant then demurred to the information filed by State's Attorney Horner. The demurrer was sustained, and the court directed that a new information be filed by Mr. Martens, which was done. A motion was then made to quash this information on substantially the same grounds as the motion to quash the former information, which was denied. Defendant then demurred to the information on the ground that it did not describe a public offense and charged more than one offense and did not conform to the law, in that it failed to allege that shooting by defendant was unlawful or felonious, unjustified or inexcusable. The demurrer was overruled, and defendant pleaded not guilty.

The information alleged, in substance, that on December 6, 1926, in Hughes county, S. D., the defendant committed the crime of manslaughter in the first degree by willfully and unlawfully, and without authority of law, aiming and discharging a loaded pistol along the public highway at and in the direction of an automobile traveling upon the highway, and at and in the direction of Donald

Pond riding in the said automobile, and that defendant did willfully, unlawfully, feloniously and without design to effect death, and under circumstances not constituting justifiable or excusable homicide, fire and discharge said pistol into the back of the body of said Donald Pond, thereby mortally wounding the said Donald Pond, of which pistol shot wound said Donald Pond died on December 6, 1926. The information clearly charges manslaughter in the first degree, and it does not charge more than one offense. The demurrer was properly overruled.

A series of alleged errors relate to the appointment of Mr. Martens as special prosecutor; the participation in the trial by D. J. O'Keeffe, another member of the bar of Hughes county; the filing of the information by Mr. Martens, signed with his own name as acting state's attorney in the case; the denial of defendant's motion to quash the information and dismiss the action because not instituted by the legally elected state's attorney of Hughes county, Mr. Horner. Mr. Horner's own testimony given upon the motion to quash the information and dismiss the action showed, to use his own language:

"I have been opposed to the prosecution of this case from the time of the Conorer's inquest and have been reluctant to prosecute. I have refused to prosecute on several occasions. I have conferred with the defendant on numerous occasions in reference to this case. It has never been in my mind that I would prosecute this case. * * * If I were required to prosecute this case, it is doubtful if I could prosecute it efficiently and do all that a State's Attorney would be expected to do in the ordinary course of a criminal procedure."

Code, § 6004, provides that the circuit court, whenever the state's attorney is adversely interested or disqualified, may by an order entered in the minutes of the court appoint some duly licensed attorney and counsellor at law to perform for the time being the duties required by law to be performed by the state's attorney, "and the person so appointed shall thereupon be vested with all the powers of such state's attorney for that purpose." It is clear beyond question that Mr. Horner was adversely interested, and disqualified to prosecute this case. He was sincerely of the opinion that no offense had been committed; that no prosecution ought to be instituted, and acting on this view he had from the beginning

done everything he could to prevent the prosecution of defendant. The order of the court appointing Mr. Martens was fully authorized by the provisions of section 6004, and under the express provisions of that section Mr. Martens had authority to file an information signed with his own name as acting state's attorney, and it would not have been proper for him to have filed it in the name of Mr. Horner. In regard to the participation of Mr. O'Keeffe in the trial, there is nothing in the abstracts brought before this court showing that he was not duly authorized to appear and assist Mr. Martens. In the absence of any showing to the contrary, this court will presume that attorneys acting in place of the regular state's attorney were properly employed on behalf of the state. State v. Bailly, 29 S. D. 588, 137 N. W. 352; State v. Tough, 12 N. D. 425, 96 N. W. 1025. What we have said also disposed of the further contention of defendant that he had no preliminary examination because the preliminary examination that was held by Judge Hughes was held over the protest of State's Attorney Horner, and was conducted on behalf of the prosecution by Mr. Martens.

It is argued by defendant that after the filing of his affidavit of prejudice against Judge Hughes that judge had no further jurisdiction in the case except to call in another judge; yet he ordered an information to be filed and had defendant arraigned. The record does not show any arraignment before Judge Hughes. It shows that he directed State's Attorney Horner to file an information in the circuit court, and that this was done.

Code, § 4813, providing for a change of judges in criminal actions, provides that if a defendant makes an affidavit that he cannot have an impartial trial by reason of the bias or prejudice of the presiding judge of the circuit court where the indictment or information is pending, the presiding judge must call in some other judge of the circuit court to preside at the trial. It will be seen that until an information is filed there is no authority to apply for a change of judges and no authority on the part of the judge to call in another judge. Judge Hughes' direction, therefore, that an information be filed and his calling in Judge Bottum immediately upon the filing of such information, the affidavit of prejudice being by that time filed, was the proper procedure. Defendant was arraigned before Judge Bottum, not before Judge Hughes.

Defendant assigns as error the refusal of the court to give

sixteen separate instructions requested by him. Some of these requested instructions were obviously not correct statements of the law as, for example, No. 13:

"The court further instructs you that if you should find that the defendant, while a peace officer of the state was lawfully engaged in the performance of a legal duty, in keeping and preserving and enforcing the law of this state, then your verdict must be not guilty."

Under this instruction an officer engaged in making an arrest for any misdemeanor, however, trifling, would be justified in discharging a loaded revolver at the person he is seeking to arrest, even if he knew that the person was unarmed, and that the arrest could be effected easily without the use of any firearm. All of the requested instructions that contained any proposition of law applicable to the case were included in the charge given by the court and defendant was not prejudiced by the refusal to give any requested instruction. The court instructed the jury that manslaughter in the first degree is the killing of a human being by another when perpetrated without design to effect death and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon, unless it is committed under such circumstances as to constitute excusable or justifiable homocide, and further informed the jury what constituted excusable or justifiable homicide. The court further gave the following instructions numbered 5—1 to 5—4 and 6.

"5—1. Homicide is also manslaughter in the first degree when perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor.

"5—2. Every person who willfully discharges any species of firearm in any public place or in any place where there is any person to be endangered thereby, although no injury to any person shall ensue, is guilty of a misdemeanor.

"5—3. No act which under these instructions the Defendant would have a right to do under the law would constitute a misdemeanor.

"5—4. On the other hand, if the death of the deceased was caused by the wilfull discharge of a firearm by Defendant in a public place or a place where there was a person endangered thereby and the same was not done necessarily in the securing of the

arrest of deceased after notice of his intention so to do, said act would constitute manslaughter in the first degree.

"6. In order to warrant you in finding the Defendant guilty, you must be satisfied beyond a reasonable doubt that on December 6th, 1926, in Hughes County, South Dakota, the Defendant by means of a dangerous weapon shot and killed the said Donald Pond, and that the same was not committed under such circumstances as constitute excusable homicide. Or, you must find that at the said time and place the Defendant shot and killed the said Donald Pond and at the time of said killing, without a design to effect death, the said Defendant was engaged in the commission of a misdemeanor. And if you so find you will render a verdict finding Defendant guilty of manslaughter in the first degree. If you do not so find you will find him not guilty."

A person is not exempted from obedience to law because he is a public officer. Code, § 3955, making it a misdemeanor for any person to discharge a firearm in a public place or in a place where there is any person to be endangered thereby, applies to officers as well as to others. But if a private citizen were attacked by another in a public street and his life endangered by his assailant, and in necessary self-defense he should discharge a firearm at his assailant, he would not be guilty of violation of section 3955, and in like manner if an officer should necessarily discharge a firearm in a public highway in the necessary performance of duty imposed on him by law the discharge of such firearm would constitute no violation of section 3955. This aspect of the case was clearly stated to the jury in instruction 5—3, where they were told that no act which defendant would have a right to do under the law would constitute a misdemeanor. We do not think there was any error in giving the instructions 5—1 to 5—4 and instruction No. 6. Appellant refers to Code, § 4549 (he evidently means section 4550), providing that if after notice of intention to arrest the defendant, he either flees or forcibly resists, the officer may use all necessary means to effect the arrest, and argues that the undisputed evidence shows that appellant gave deceased and Humphrey notice of his intention to arrest them, and that nevertheless they continued to flee, and that therefore defendant was justified in firing at the tire of their car as a necessary means of effecting the arrest. The court carefully instructed the jury on this point and informed them

that if they should find that deceased and his companion Humphrey, after notice of the officer's intention to make an arrest, attempted to flee from such officer, then defendant was justified in using all necessary means to effect the arrest. It is finally argued that the evidence is insufficient to justify the verdict. It is said that the evidence "demonstrates to a mathematical certainty that Melvin J. Bute did not fire the shot that killed Pond." This argument is based on the testimony of a witness who, while the Ford car was standing on a cement floor, sighted through the hole in the back seat of the car supposed to have been made by the bullet and testified that the line of sight projected onward would strike the ground about fifty feet distant, and defendant's counsel propounds the query: "What or who killed Pond? Whatever it was, the defendant had nothing to do with it, and it is admitted that he fired only one shot." Whether this witness' calculation based on sighting through the hole when the car stood motionless on the cement floor would be of any value in establishing the course of the bullet through the car while it was traveling along an unpaved highway, need not be considered, because the evidence is clear that Pond was killed by a bullet wound, and it is undisputed that there was but one shot fired in the neighborhood of his car at the time, and that was fired by defendant, and that immediately thereupon Pond slumped over and never afterwards spoke. The testimony was likewise undisputed that when an undertaker who was deputy coroner was called to the hospital on the night of December 6th, and found Pond's dead body in the car, he asked who did this, and defendant said, "I must have did it." The evidence was clearly sufficient to sustain the verdict.

The judgment and order appealed from are affirmed.

POLLEY, P. J., and CAMPBELL, J., concur in result.

ROBERTS, J., disqualified and not participating.

BURCH, J. (concurring specially). I think the result reached is correct, but I cannot consent to the doctrine that instructions 5—1, 5—2, 5—3, 5—4, and 6 are not erroneous. I think they have no application to the case and if defendant had been convicted of manslaughter in the first degree they would have been highly prejudicial. Defendant shot and killed Pond. The jury must characterize that act as a single transaction. The jurors can render

but one verdict. If that verdict is not guilty, they acquit of all wrong. If their verdict is for unlawful shooting, a misdemeanor, they acquit of felony and of justifiable or excusable homicide. The verdict operates both ways. It fixes the precise offense. The offense is neither more nor less. For all legal purposes the act is just what the jurors find it to be. The defendant cannot thereafter be prosecuted or punished for either a higher or lower offense while the verdict stands. As to those he has been acquitted. What the jury might have found to be a misdemeanor has on investigation been found to be not a misdemeanor, but a component part of a felony. A homicide which would not be manslaughter in the first degree, except for the fact that the slayer was engaged in the commission of a misdemeanor at the time of the killing, cannot be raised to the aggravated degree, by the simple process of reasoning that the included offense of assault is a misdemeanor, therefore defendant was engaged in a misdemeanor and consequently guilty of manslaughter. A mere included offense which is in reality nothing but a lower degree of the same offense does not aggravate the homicide. Any other view would lead to ridiculous results. To sustain the instructions complained of would lead by logical deduction to every unlawful act of violence resulting in death being murder.

But the jury did not resort to the reasoning suggested to them by the erroneous instructions. They acquitted defendant of manslaughter in the first degree, and for that reason I am unable to see how those instructions were prejudicial. The verdict was manslaughter in the second degree. This verdict is proper if the killing resulted from the culpable negligence of defendant.

Conceding all that defendant claims for his act, namely, that he was attempting to arrest deceased and to stop the car in which deceased was riding, he fired his gun at the tire of the car and by accident killed deceased. By doing so he employed a force to stop the car which was exceedingly dangerous to the life of the occupants of the car unless controlled with great precision. It was not so controlled, and unless defendant was such a master hand with a gun as to be morally certain he could hit the tire and hit it exactly right to puncture it, there could be little use in using the gun at all. A jury might properly say the use of the gun on a mere chance of hitting the tire was culpable negligence. Such culpable

negligence having caused the death of Pond, they might properly find defendant guilty of manslaughter in the second degree.

I am loath to throw any unnecessary burden upon officers in the discharge of their duties. But where their safety is in no way endangered and all they have to fear is the possible escape of a miscreant wanted for a misdemeanor, they should devise some means of taking him alive. I concur in affirming the judgment.